## YOUNG *et al. v.* BALTIMORE COUNTY HEDGE & WIRE FENCE Co.

*(Circuit Court, D. Maryland.　June 21, 1892.)*

1. PATENTS FOR INVENTIONS—LIMITATION OF CLAIM—HEDGE FENCES.
    Patent No. 254,085, July 21, 1882, *held* to be for a wire extending along the base of a hedge near the ground to prevent the passage of small animals before the shoots of the hedge are grown.
2. SAME—NOVELTY.
    *Held*, that the patent is void for want of patentability, it being old to use such a wire to keep the plants in position, and to give the hedge increased lateral strength, and it being old to use a wire along the base of an ordinary fence to prevent the passage of small animals.

*(Syllabus by the Court.)*

In Equity.　Bill by Wesley Young and the Maryland Hedge & Wire Fence Company against the Baltimore County Hedge & Wire Fence Company for infringement of patent.　Bill dismissed.

*Wood & Boyd,* for complainants.

*G. L. Van Bibber, M. Bailey,* and *W. F. Mitchell,* for respondent.

MORRIS, District Judge.　The bill of complaint in this case alleged the infringement of four patents, but the bill has been dismissed as to all except the patent to Wesley Young, No. 254,085, dated July 21, 1882.　That patent is for an improvement in "plashed hedges."　The claim is a narrow one, for a single and simple improvement.　The patentee, Young, describes the method of plashing hedge fences as practiced at the date of his application, which he says is by bending over the plant in the line of the fence, the bending taking place in the root, and securing the first plant in its bent position by fastening it to a stake, then a piece of wire is passed under the first plant quite near the ground and crossed and twisted around the next plant, and in like manner around as many succeeding plants as the wire is capable of holding in their proper relative positions; it being intended that the wire shall cross the plants approximately at right angles to their inclined positions, and so that every plant is held down in its inclined position and in the plane of the fence. In describing this method, which he states was then in use, he says: "Or one or more of the lines of wire may be stretched first, and the plants bent down and secured in position by attaching them to the wire."　He further says:

"The present invention looks to the still further development of this branch of industry, and has for its object to provide a hedge fence which from the time it is first plashed will present a strong and impassable barrier to all ordinary stock which is permitted to run at large, and the proper growth of which hedge will not be interfered with by the causes ordinarily existing. * * * In order to give the fence the requisite degree of lateral strength at the start, I apply a continuous horizontal line or lines of wire or other material along it from end to end, securing the said line or lines to the plants by staples, nails or loops or other suitable fastenings, as shown in the drawing, or by interweaving it with the plants as shown.　I preferably apply two lines of wire, one near the upper ends of the plants after they are plashed and cut off to the proper height, and one near their base, as repre-

sented in the drawing, though other intermediate lines of wire may also be employed if thought necessary. I also prefer to employ barbed wire, as that affords additional effectiveness as a barrier to stock, but plain wire will answer reasonably well. * * * The lower wire is indispensable, for by its aid the openings between the plants are closed at the bottom from the start, and small pigs are prevented from passing through, thereby enabling the side shoots of the plants to extend out and close the openings effectively, making a firm, close fence, as soon as the plashing is done. This lower wire should be placed quite near the surface of the ground to be most effective. It will be seen that additional lateral strength of the fence is secured by the employment of the two lines of wire, one at the top and another at the bottom, with or without intermediate lines, and, *secondly*, that the effectual closing of the lower intervals of the fence, to enable the shoots to properly develop, is accomplished by the lower wire alone. I am aware that it is not new to place a line of barbed wire along the bottom of a post and board fence for the purpose of preventing small animals from passing under the fence; also that it is not new to interweave in the upper portion of a live hedge fence withes or branches not a part of the growing fence, and such construction I do not claim as my invention. Neither do I claim a hedge fence on which the plants are plashed together by means of a continous line of wire wound around them from one to another, near the upper ends, as shown in patent to D. M. Kirkbridge, May 30, 1876."

The claims are:

(1) A hedge fence composed of live plants, bent down in the plane of the fence, and held in place by suitable fastenings, and having a line of wire extending along the base of the plants near the ground, said wire being secured to the plants, and operating to prevent the passage through the spaces between the plants of small stock before said spaces have become closed or protected by the growth of the shoots, substantially as described. (2) A hedge fence composed of live plants bent down in the plane of the fence, and held in place by suitable fastenings, and having a horizontal line of wire extending along the upper portion of the plants, and secured thereto, to give increased lateral strength, and having also a horizontal line of wire extending along and secured to the bases of the plants, for preventing the passage through the spaces between the plants of small stock before said spaces have become closed or protected by the growth of the side shoots, substantially as described."

The claims of the original application in the patent office were broader, but upon objection and a citation from the Gardener's Chronicle for 1873, p. 1115, and for 1875, p. 458, the applicant modified his claim so as only to cover a line of wire extending along the base of the plants near the ground, and secured to the plants, and operating to prevent the passage of small animals through the spaces between the plants before the spaces have become closed by the growth of shoots. The Gardener's Chronicle for 1875 describes an improvement in hedge culture by driving small stakes along the center of the hedge six to eight feet apart, to which a line of wire is stapled and drawn tight by being attached at the ends to gateways when they occur in the line of the fence. It is said:

"The principal uses and advantages of the wire thus inserted are to constitute a permanent backbone, as it were, to the hedge, thereby preventing animals, as cattle and horses, from pushing themselves through, which they

are very liable to do at all thin and weak parts of a hedge.   When once the hedge grows over and fairly covers the wire, the posts are of little further use, and do not require renewal, as the fence itself sufficiently supports the wire, and keeps it ever afterwards in its place."

The only differences between what is described in the publication from which the above is taken, and what is claimed in Young's patent, is that by Young's method it is stated that the wire is to be used earlier in the life of the hedge,—that is to say, when it is first plashed,—and that the lower wire is to be placed quite near the ground, so as to intercept small animals before the lowest shoots are sufficiently grown to make a barrier.   It is not said in Young's method whether the wires are to be stretched taut between convenient posts or not, but it is obvious that in practice this would be done if practicable.   In Young's method the wires are to be stapled or otherwise suitably fastened to the plants, and in the published method the wires were at first to be stapled to the small posts, but in the end the plants supported the wire.

At the threshold of the consideration of the patentability of these matters connected with growing hedge fences, it suggests itself that the plashing of the hedges, that is, the bending over of the plants at the roots in the line of the fence, all at the same angle, and securing them in that position, and the discovery of the fact that growing in that position the shoots tend to spread out lower down, and the shoots of the lower inclined plants tend to interlace with those of the upper plants so as to form an effective, vigorously growing hedge fence, all this to the first discoverer, and also the best means of accomplishing it, might fairly be matters requiring invention, and proper to be protected by a patent.   But it also suggests itself that, after this method of growing a hedge was known, the use in connection with it of anything in such common use and so obvious as a line of wire along the hedge, or interweaved in the hedge, for the purposes of a fence, merely, and to prevent animals from passing through where the hedge was too weak itself to prevent them, could not be a discovery or require invention.

It is said that no one before Young systematically used the lower wire for this purpose, or taught the public how essentially important it was to the proper growth of the lower shoots of the plants that they should be thus protected, and no one before Young, it is said, for this reason, was uniformly successful in growing, at a moderate cost, an effective hedge fence.   But this is not showing Young to have been an inventor, but merely that he does systematically and thoroughly, and with a sense of its importance, what others had the means of doing, and knew how to do, but did not appreciate the importance of.   Just as a man may know that a certain treatment is good for his fruit trees, but does not obtain the best results because he does not use it intelligently at the right times and in the best manner.

The use of a wire along the base of an ordinary fence is admitted in the specification to be a common means of preventing the passage of small animals.   Such a wire would be fastened in any suitable way, either to the fence itself or to stakes put down for that purpose.   And it

would either be stretched taut or interweaved, as might be convenient. It would, with many ornamental fences or palings, answer the double purpose of preventing the animals passing in and out, and also of preventing the injury to the fence itself from the abrasion and forcing asunder which results when animals are frequently pushing through and enlarging an opening. In the growing hedge fence, the lower wire performs exactly these same uses. It is more important, and the consequences of neglecting its timely use are more serious, just to the extent that a growing hedge is more easily spoiled and more difficult to repair than an ordinary dead fence. In Young's patent the only use claimed for the lower wire is as a defense against animals, and he cannot be allowed to claim it generally, as he abandoned and erased from his application those claims in which he had attempted to cover the use of the wire to keep the plants in position, and to give the hedge increased lateral strength. He was obliged to make this abandonment, because he recited in his specifications that one of the known ways of securing the plashed plants in position was by attaching them to a stretched line of wire, and the Gardener's Chronicle disclosed that it was old to use a stretched wire to give increased lateral strength, while the hedge plants were young and weak.

The decree of 19th June, 1891, in the circuit court of the United States for the western division of the western district of Tennessee, called in this case the "Memphis Decree," adjudges this patent to be valid, but confines it to a horizontal wire, "secured to the plants without any extraneous support." If the claim of the patent is to be read with this restriction, then the respondents in this case do not infringe, as it is proved that the horizontal wires used by them remain stretched taut between posts or trees or gateways, or whatever stationary objects in the line of the fence they can be conveniently attached to, and, after they are thus stretched, the plants are inclined and secured in their inclined position by being fastened to the stretched wires, using the diagonal wires only when necessary to keep a plant in position which was more than ordinarily stiff and refractory. But I think in the present case it has been shown by the complainant's witnesses, and notably by their expert witness, See, that the end attachments of the horizontal wires have no bearing upon the construction of the claims of the patent; and I conclude, as does complainant's witness that at least a preliminary use of a post, or some fixed object to which the ends of the wire might be fastened, is clearly implied by the specification of the patent itself.

Upon the whole case, my conclusion is that, in view of what had been before done, the claim for a line of wire secured to the plants near the ground, to prevent the passage of animals, is void for want of patentability; and that, however beneficial its timely use as pointed out by Young may be, it is an improvement in the art of hedge making, resulting, not from invention or discovery, but from the more systematic and thorough attention to the fact that the young shoots at the base of the plants ought to be protected against small animals until they are sufficiently grown to be a barrier themselves. Bill dismissed.